**HIGHWAY & LOCAL MOTOR FREIGHT EMPLOYEES LOCAL UNION NO. 667, affiliated with the International Brotherhood of Teamsters, AFL–CIO, Plaintiff–Appellant,**

v.

**WELLS LAMONT CORP.,**
**Defendant–Appellee.**

No. 01–6404.

United States Court of Appeals, Sixth Circuit.

July 7, 2003.

Before BOGGS, SUHRHEINRICH, and SILER, Circuit Judges.

PER CURIAM.

Plaintiff-Appellant Highway and Local Motor Freight Employees Local Union, No. 667 ("Union") appeals the district court's grant of summary judgment in favor of Defendant–Appellee Wells Lamont Corp., which upheld an arbitrator's decision that the termination of Union Steward Larry Woods for insubordination was not in violation of the collective bargaining agreement ("CBA") between the Union and Wells Lamont.

The Union claims that the arbitrator's decision did not "draw its essence" from the CBA. Specifically, the Union claims that under the express terms of the CBA, Wells Lamont can only terminate an employee for "just cause," and that Woods was not terminated for "just cause." We affirm the decision of the district court and uphold the arbitrator's decision.

## I. Facts

### A. The 1995 and 1998 CBAs

Wells Lamont Corporation is a Chicago, Illinois-based glove manufacturer and wholesaler, with its largest warehouse in Memphis, Tennessee. In 1995, Wells Lamont and the Union entered into a CBA covering all of the Memphis warehouse employees. Article VIII of the CBA, entitled "Discipline and Discharge," stated, in Section 1, that Wells Lamont "shall not discharge, suspend, or discipline any employee without just cause," and listed seven infractions from "provoking or engaging in any kind of physical violence during working hours ..." to "selling or otherwise distributing drugs or alcohol," as examples of what constitutes just cause for discipline. The list, however, did not include insubordination. Section 2 of Article VIII contained rules pertaining to written notice of warnings for minor infractions, and is not relevant to this appeal.

Article II of the CBA, entitled "Management Rights," reserved for Wells Lamont the power to issue work rules. Specifically, this section provided: "[Wells Lamont] has and shall retain the sole and complete authority and discretion in regard to the management of the business and the direction of the working force, including, but not limited to, the right to establish, regulate, determine, revise, or modify: policies, practices, and procedures of the conduct of the business; ... hiring, promotion, *termination,* demotion or transfer; ... quality, work and production standards; ... reasonable rules and regulations for the conduct and safety of employees and the means of enforcement thereof; ...." (emphasis added).

In 1998, the 1995 CBA expired and Wells Lamont and the Union entered into a new CBA. The 1998 CBA was in place at the time of Woods' termination, and expired in 2001. The 1998 CBA was identical to the 1995 CBA in all regards, except that the drafters had deleted Article VIII, Section 1. In other words. Article VIII no longer contained either the language requiring "just cause" for discharge, or the list of infractions that constituted "just cause." Article VIII. Section 2 from the

1995 CBA was now labeled Section 1. Article II and all other provisions from the 1995 CBA remained intact.

After enactment of the new CBA, Wells Lamont issued a three-page memorandum on July 28, 1998, to all Memphis employees. The title of this memorandum was "Work Rules." Via this memorandum, Wells Lamont created two groups of infractions. "Group 1" listed infractions authorizing "progressive discipline." This list contained infractions such as "failure to complete reasonable assigned tasks during working time," and "repeated and/ or excessive absenteeism or tardiness." "Group 2" listed more serious infractions, which authorized "immediate discharge." The first infraction listed in "Group 2" was "insubordination, defined as refusal to follow the direct order of a supervisor, except where the employees (sic) feels his/her personal safety may be in jeopardy."

Article XII of both the 1995 and 1998 CBAs provides a three-step in-house procedure for dealing with grievances by Union members. Section 3 of Article XII provides that: "[i]f the grievance is not satisfactorily resolved in Step Three (of the in-house procedure), the union may . . . request that the grievance be resolved by an impartial arbitrator."

### B. The Termination of Larry Woods

On October 9, 1999, Larry Woods, a Union steward and fork lift driver employed by Wells Lamont for the previous twenty-six years, took photographs of several other employees in the warehouse. Two of the employees of whom Woods took photographs, Rick Boyd and Marvin Quarrels, complained of Woods' activities to Dale Blum, the general manager of the Memphis Distribution Center. Blum asked Woods if he had been taking pictures in the warehouse, and Woods admitted doing so. Blum twice instructed Woods that he was giving him a "direct order" to turn over the camera. Each time, Woods refused. Blum ordered Woods to remain in Blum's office while Blum retrieved Clifton Bates, the supervisor on duty, presumably to have a witness to the conversation. However, Woods refused to remain in Blum's office, and preceded Blum out of the office. Woods took his camera, punched out for the day, and left the warehouse.

Blum immediately suspended Woods and terminated him sometime on or about October 20, 1999, citing violation of "Group 2, Rule 1," to wit, insubordination, as reason for the termination. Specifically, Blum fired Woods for refusing a direct order to turn over the camera and film.

On October 25, 1999, Woods filed a grievance with Wells Lamont, pursuant to Article XII. Section 1, of the 1998 CBA. In his grievance. Woods stated that Blum's request for the camera was unfair and his termination was thus unjust because Woods was taking pictures only because he was a union steward investigating an on-the-job grievance.

### C. Arbitration Hearing

Pursuant to Article XII, Section 3 of the 1998 CBA, the Union pursued this matter to arbitration. Woods and the Union argued that Woods' termination was unjustified because Woods could only be fired for "just cause." Woods, however, acknowledged that Article VIII of the 1998 CBA no longer contained a "just cause" provision. He instead argued that the "just cause" provision was unintentionally deleted from that section due to a clerical error, and should be read back into the CBA as the intent of the parties.

The arbitrator found that his jurisdiction in this matter was limited by Article XII, Section 3, of the 1998 CBA, which states:

(An arbitrator's decision) must be limited to the interpretation and application of the specific provisions of the (CBA), and the arbitrator shall not have the authority to modify or amend the provisions of this (CBA). In addition, the arbitrator's decision shall be limited to the issues or claims specifically set forth in the written grievance submitted under Step Three, and the arbitrator shall not make any findings or determinations or rule on any claims or issues not expressly contained in the written grievance....

Under this language, the arbitrator found that he could only address the issues raised by Woods in his written grievance. The arbitrator found he lacked jurisdiction to address whether the "just cause" provision had been unintentionally deleted from the 1998 CBA because Woods had never raised that claim in his Article XII grievance. Instead, the arbitrator found that he could only address whether Wells Lamont had the power to terminate Woods under the express terms of the 1998 CBA as written.

Ultimately, the arbitrator ruled that, under Article II of the 1998 CBA, Wells Lamont had the discretion to create work rules and means of enforcement, which it did in the July 28, 1998, memorandum. The arbitrator further found that, under the plain language of Article VIII of the 1998 CBA, there is no longer a "just cause" requirement. Also, the arbitrator found that the July 28, 1998, memorandum authorizes Wells Lamont to fire an employee for any of the enumerated reasons in "Group 2," and implied within that authority is a requirement that any termination must not be "arbitrary and capricious." The arbitrator found that Woods' termination was not arbitrary and capricious, and that Woods' grievance should properly fail.

Specifically, the arbitrator relied on the following findings to demonstrate that Woods' termination was not arbitrary and capricious. First, Woods knew that insubordination was a "Group 2" infraction. Second, Woods, as a Union steward, knew the definition of insubordination. Third, Blum issued a direct order to Woods to turn over the camera. Fourth, Woods heard and understood the order. Fifth, Woods disobeyed the order. Sixth, under the definition of insubordination in the July 28, 1998, memorandum, the only reason under which an employee may disobey a direct order is for safety concerns. And finally, safety concerns did not justify Woods' insubordination. Accordingly, the arbitrator denied the grievance.

Following the denial of his grievance, and pursuant to § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), Woods appealed this matter to the district court below. The district court affirmed the arbitrator's ruling on October 22, 2001. The court found that the arbitrator's decision "drew its essence" from the CBA, and accordingly was final and binding on the parties pursuant to Article XII of the 1998 CBA. Woods filed the instant appeal to this Court on October 30, 2001, and this action is timely before us pursuant to Fed.R.App.P. 4(a)(1)(A).

## II. Analysis

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*. *See Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 274 (6th Cir.2003). However, we give the arbitrator's decision more than substantial deference, and review it very narrowly. *See, e.g., United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *Gen. Truck Drivers, Local 957 v. Dayton Newspapers,*

*Inc.*, 190 F.3d 434, 437 (6th Cir.1999). This is so because of the public policy favoring arbitration, *see, e.g., Cement Divs., Nat'l Gypsum Co. v. United Steelworkers of Am.*, 793 F.2d 759, 766 (6th Cir.1986) as well as the bargained-for commitment of the parties to consider arbitration their only and final means of resolving disputes. *See United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Essentially, the federal courts are limited to deciding whether a claim is governed by the CBA, and if it is, then the arbitrator's decision is binding, and we shall uphold it as long as it "draws its essence" from the CBA, and is not merely the arbitrator's "own brand of industrial justice." *Id.* at 597; *see also United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). Moreover, it is only relevant whether the arbitrator's *final decision* "draws its essence" from the CBA, and not necessarily his analysis. *See Misco.* 484 U.S. at 36.

■ We have held that an arbitrator's decision fails to "draw its essence" from the CBA only when: 1) it conflicts with the express terms of the CBA; 2) it imposes additional requirements not expressly provided for in the agreement; 3) it is not rationally supported by nor derived from the CBA; or 4) it is based on equity rather than the terms of the CBA. *Cement Divs., Nat'l Gypsum Co.*, 793 F.2d at 766. Accordingly, we will first examine the express terms of the CBA to ensure that the arbitrator's decision complies.

### B. The Arbitrator's Decision

For the arbitrator's decision to be proper, it must not be contradictory to the express terms of the CBA. Article II of the CBA grants Wells Lamont "sole and complete authority and discretion in regard to the management of the business and the direction of the working force, including, but not limited to ... hiring, promotion, termination, demotion or transfer;...." Article II further provides the caveat that Wells Lamont's discretion in these areas extends only as far as its rights are not "specifically and expressly limited elsewhere in the (CBA)...."

The Union contends that the arbitrator's decision is in contrast to the plain language of the CBA because a "just cause" requirement, though admittedly absent from Article VIII, appears in Article VII. Article VII, Section 5(b), entitled "Termination of Seniority," provides that "[a]ll seniority shall cease and an employee shall be terminated from the payroll when any of the following occurs: ... (b) (the employee) is discharged for just cause."

The arbitrator did not address Article VII, presumably because the Union did not raise it until this appeal. Nonetheless, the arbitrator is charged with interpreting the contract and giving credence to all its language. The Union argues that Article VII cannot be read apart from Article II. The Union asserts that because a termination also includes the loss of seniority, any discharge is subject not only to Article VIII's "Discharge and Discipline" rules, but also to Article VII's "Seniority" rules as well.

However, Article VII deals only with instances where an employee loses his seniority. The question before the arbitrator, pursuant to Woods' grievance, was whether Woods was properly *terminated* under the CBA, without regard to his seniority. We find it reasonable that the arbitrator look first to the "Discharge and Discipline" section rather than the "Seniority" section for the answer.

Although the Union's logic is sound that one cannot be terminated without losing

seniority, the CBA is at best ambiguous. It is clear from the CBA that one of two things has occurred in the drafting of the 1998 CBA. Either the drafters inadvertently left the "just cause" provision in Article VII, or they inadvertently deleted it from Article VIII. In either event, the result is an unclear CBA. Article VII merely states that "[a]ll seniority shall cease ... when any of the following occurs." But the language does not suppose that the list is exclusive. Nor can it be because the list lacks situations in which seniority would clearly cease. For example, "death" is not listed as a reason an employee could lose seniority.

We are not charged with the task of interpreting the CBA, and our own reading is therefore irrelevant. We are only charged with the task of determining whether the arbitrator's position is not contradictory to the CBA's plain language. Given the ambiguous nature of the interrelation of the several articles of the CBA, we have no discretion but to accept the arbitrator's reading and defer to his position.

■ But even if there were a "just cause" requirement in the CBA, the arbitrator's decision would nonetheless "draw its essence" from the terms of the CBA. In the 1995 CBA, Article VIII provided seven infractions that constituted "just cause" for termination. Conversely, the 1998 CBA contains no definition of "just cause." Accordingly, we would have no reason to adhere to the 1995 definition of that phrase. We find that the term "just cause," wherever it occurs in the 1998 CBA, means nothing more than its common definition. "Just cause," defined, means "[a] cause outside legal cause, which must be based on reasonable grounds, and there must be a fair and honest cause or reason, regulated by good faith." BLACK'S LAW DICT. 863 (1990). In other words,

even under a "just cause" standard, Wells Lamont has the authority to terminate any employee, as long as it follows its own guidelines and the termination is not arbitrary and capricious. This is exactly the standard the arbitrator proposed, stating that even if no "just cause" requirement exists in the CBA, Wells Lamont is nonetheless bound by an "arbitrary and capricious" standard of fairness. The nomenclature essentially presents a distinction without a difference. Wells Lamont's July 28, 1998. "Work Rules" memo is essentially a list of reasons for termination for "just cause."

■ Accordingly, under either the Union's or Wells Lamont's reading of the CBA, Wells Lamont has the authority under Article II to provide rules for termination, and may terminate any employee, as long as its reasons for doing so are not arbitrary and capricious. The arbitrator found that Wells Lamont's termination of Woods was not arbitrary and capricious, and deference must be given his holding. Accordingly, we uphold the arbitrator's decision, finding that it "draws its essence" from, and is not contrary to, the express language of the 1998 CBA.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court for the Western District of Tennessee, and uphold the decision of the arbitrator in this case, denying Larry Woods' grievance and upholding his termination.